FILED
2008 Jan-22  AM 09:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **KARON RAY STANFORD,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **CASE NO. CV 06-B-0048-W** |
| | } | |
| **KENNETH RANDALL** | } | |
| **McDANIEL; MATTHEW** | } | |
| **ROBERT HOOD; IRONMAN** | } | |
| **MOVING SERVICE, LLC,** | } | |
| | } | |
| **Defendants.** | } | |
| | } | |
| **UPS FREIGHT, f/k/a OVERNITE** | } | |
| **TRANSPORTATION COMPANY,** | } | |
| | } | |
| **Intervenor Plaintiff,** | } | |
| | } | |
| **vs.** | } | |
| | } | |
| **KARON RAY STANFORD,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is currently before the court on Ironman Moving Service, LLC's and

Matthew Robert Hood's Motion for Partial Summary Judgment, (doc. 31-1),[1] and

Kenneth Randall McDaniel's Joinder in Partial Motion for Summary Judgment as to

Wantonness filed by Matthew Hood and Ironman Moving Service, LLC, (doc. 37).  Upon

consideration of the record, the submission of the parties, the arguments of counsel, and

---

[1]    Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

the relevant law, the court is of the opinion that Hood's and Ironman's Motion for Partial

Summary Judgment is due to be denied, and McDaniel's Motion for Joinder is due to be

denied.

## I. <u>STATEMENT OF FACTS</u>[2]

Plaintiff's claims arise from the circumstances surrounding an automobile accident

which occurred in the early morning hours of June 23, 2005.[3]  (Doc. 1, Compl. at 2, ¶ 8.)

Karon Ray Stanford ("Stanford" or "plaintiff") was driving a truck for his employer,

Overnite Transportation Company, west-bound on Highway 78 in Walker County,

Alabama.  *Id*.  At the same time, a truck owned by Defendant Ironman Moving Service,

LLC ("Ironman"), and driven by either Kenneth Randall McDaniel ("McDaniel") or

Matthew Robert Hood ("Hood"), was traveling east-bound on Highway 78.[4]  The

---

[2]  As required when determining a Motion for Summary Judgment, the Statement of Facts reflects the facts in the light most favorable to Ms. Stanford, the non-moving party.  All disputed facts are resolved in her favor and all reasonable inferences arising from those facts are drawn in her favor.  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 3188-89, 111 L. Ed. 2d 695 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

[3]  The parties represent that June 23, 2005, the date on which the subject collision occurred, was a Saturday.  However, a review of a calendar for the year 2005 reveals that June 23, 2005 was, in fact, a Thursday.  Although the parties refer to days of the week when reciting the events leading up to the accident, in the interest of accuracy, the court has attempted to determine the dates on which each event likely occurred and has used those dates in its recitation of the facts.

[4]  Because there is a dispute as to who was driving Ironman's truck at the time of the accident, Stanford has sued both Hood and McDaniel.  However, as previously discussed, McDaniel's Motion for Joinder in Motion for Partial Summary Judgment will be denied.  Therefore, he does not have a Motion for Summary Judgment before the court.  In addition, the question of whether Hood or McDaniel was driving the truck is not before the court at this time.

Ironman truck left the highway on the south side of the east-bound land, overcorrected, crossed the median, entered onto the west-bound lane, and into oncoming traffic.  *Id*., ¶ 9. Stanford attempted to avoid the Ironman truck, but was unable to do so, and the two trucks collided causing serious injuries to plaintiff.  *Id*. at 3, ¶ 9; *Id*. at 4, ¶ 15.

Ironman is a very small, household goods moving company in Athens, Georgia, run by its owner, Matthew Comer, out of his residence.  (Pl.'s Ex. 2, Comer Depo. at 17-19.)  At the time of the accident, McDaniel and Hood had been on duty for several days. They began their trip on June 20, 2005 by driving from Athens to Atlanta where they picked up a load of furniture, drove from Atlanta to St. Louis, unloaded the truck, and spent the night of June 21, 2005 at a motel between St. Louis and Springfield, Missouri.[5] (Pl.'s Ex. 2, Comer Depo. at 89, 91; Pl.'s Ex. 3, Hood Depo. at 31, 64.)  On the morning of June 22, 2005, McDaniel and Hood drove to Springfield to pick up a new load.  *Id*.  In Springfield, McDaniel and Hood spent seven to nine hours carrying a family's household goods down three or four flights of stairs and loading the goods into the truck.  (Pl.'s Ex. 3, Hood Depo. at 29, 32-33, 65.)  Prior to leaving Springfield,  between 9:00 p.m. and 11:00 p.m. on the evening of June 22, 2005, McDaniel spoke with Comer.  During their conversation, Comer questioned McDaniel about "the sleeping situation" because,

---

Therefore, the court will refer to the driver of Ironman's truck generically as "the driver."

[5]  Defendants did not file a Reply to Stanford's Response to the Motion for Partial Summary Judgment, (doc. 35).  Therefore, pursuant to Exhibit A of this court's Scheduling Order, (doc. 16), Stanford's "Additional Undisputed Facts" are deemed admitted by defendants for summary judgment purposes.

according to Comer, "it was a tough move they did that day." (Pl.'s Ex. 3, Hood Depo. at 33-35, 65; Pl.'s Ex. 2, Comer Depo. at 98, 106-07.) Comer says that he "begged and pleaded" that the pair get a motel room, and that he even offered to pay for the room. (Pl.'s Ex. 2, Comer Depo. at 99.) Comer acknowledged that McDaniel was "loose" about spending the night at a motel, presumably meaning that McDaniel would not agree for certain that he would do so. *Id*. at 108. The drivers did not check into a motel. Instead, they left Springfield with the intention of driving straight through to Birmingham in the hopes that McDaniel would be able to get home for his child's birthday. (Pl.'s Ex. 3, Hood Depo. at 36, 38-39.) At around 6:20 a.m. on June 23, 2005, in Walker County, Alabama, the Ironman truck collided with a truck driven by Stanford. (Doc. 34 at 4, ¶ 1.)

Hood and McDaniel each claim that, at the time of the accident, he was asleep in the passenger seat. (Doc. 34 at 5, ¶ 3.) Neither claims to have any memory of the events leading up to the collision, or of the collision itself. (*Id*.)

## II.  <u>McDANIEL'S MOTION FOR JOINDER IN MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Defendant McDaniel has filed a Motion by which he seeks to join in the Motion for Partial Summary Judgment filed jointly by his co-defendants. (Doc. 37.) Plaintiff has filed a Brief in Opposition to McDaniel's Motion. (Doc. 38.) Plaintiff opposes McDaniel's attempt to join in the Motion for Partial Summary Judgment on the ground that it was filed long after the May 1, 2007 deadline for filing dispositive motions as set

4

by the Amended Scheduling Order entered by this court on October 17, 2006.  (Doc. 26.)

Indeed, McDaniel did not file his Motion to Join his co-defendants' Motion for Partial

Summary Judgment until June 18, 2007, almost one month after the briefing of his co-

defendants' Motion was completed.  (See, Docs. 34, 35.)  For the forgoing reasons,

McDaniel's Motion for Joinder in Partial Motion for Summary Judgment will be denied.

### III.  <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**A.    SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the

record shows "that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving

party bears the initial burden of showing no genuine issue of material fact and that it is

entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604,

608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970).  Once

the moving party has met its burden, Rule 56(e) requires the non-moving party to go

beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P.

56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh

the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." *Id.* At 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id.* At 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference.  *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

**B.    THE DRIVER**

Stanford alleges that the driver wantonly and/or negligently caused the motor vehicle accident at issue by falling asleep while driving the subject Ironman truck. Defendants concede that plaintiff has presented sufficient evidence to create a jury question as to whether the driver acted negligently.  Thus, the only question before the court on summary judgment is whether plaintiff has presented evidence sufficient to support his claim against the driver for wantonness.

"Wantonness is the conscious doing of some act or omission of some duty under knowledge of the existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result."  *Lankford v. Mong*, 214 So.2d 301, 302 (Ala. 1968).  In *Lankford*, the Alabama Supreme Court "articulated for the first time in Alabama the elements of wanton misconduct in a situation where a driver is accused of falling asleep at the wheel."  *Roszell v. Martin*, 591 So.2d 511, 513 (Ala. Civ. Ct. App. 1991).  The *Lankford* court stated as follows:

> A driver of an automobile is not guilty of wanton or wilful misconduct in falling asleep while driving unless it appears that he continued to drive in reckless disregard of premonitory symptoms [of the approach of sleep]. Generally speaking, if it appears that the driver of an automobile has been without sleep for a considerable period of time and has experienced symptoms of the approach of sleep, the fact that he continues to drive under such circumstances has been held to manifest a willful and wanton disregard for the safety of others . . .

214 So.2d at 303.  "This standard for wantonness has been held to apply also in cases of diminished alertness, where a driver is alleged to have had a 'consciousness or awareness of sleepiness, tiredness, and fatigue but continued to drive with reckless indifference to the consequences.  Thus, the requisite knowledge for the imposition of liability in such cases is 'a realization of the "premonitory symptoms" of sleep.' "  *Roszell v. Martin*, 591 So.2d at 513 (quoting *Tew v. Jones*, 417 So.2d 146, 147 (Ala. 1982)).

To survive summary judgment on his wantonness claim, Stanford must proffer ***substantial evidence*** from which a jury could find that the driver continued to drive in reckless disregard of premonitory symptoms of the approach of sleep.  See *Cottingham*, 634 So.2d 1004.  Further, in order to maintain his claim for punitive damages based on the driver's alleged wantonness, plaintiff must adduce evidence from which a jury could make the requisite finding, that the driver continued to drive in reckless disregard of premonitory symptoms of the approach of sleep, by ***clear and convincing evidence***.  Ala. Code §§ 6-11-20(a), (b)(3)-(4).

Defendants contend that because "[n]o one involved in the accident has any memory of how the accident occurred," plaintiff has failed to adduce evidence sufficient

7

to take his claim of wantonness to a jury.  However, "a driver's realization of such premonitory symptoms need not be shown by direct proof and may be made to appear by showing circumstances from which the fact of actual knowledge is a legitimate inference. . . " *Roszell*, 591 So.2d at 514.

In *Roszell*, a case decided under the "substantial evidence" standard, the court distinguished circumstances which do support a legitimate inference of actual knowledge of premonitory symptoms of sleep, from circumstances which do not support such an inference. 591 So.2d 511.  In that case, Shawn Hurston rented a U-Haul truck in Birmingham, Alabama for the purpose of moving furniture from Savannah, Georgia to Birmingham.  591 So.2d at 513.  Hurston was accompanied on the trip by Troy Wade Martin, with whom he shared driving responsibilities.  *Id*.  Hurston and Martin left Birmingham on the evening of March 18, 1998 and, on their return from Savannah, sometime after sundown on March 19, 1998, the two men stopped at a service station in Oxford, Alabama to get gas and to switch drivers. *Id*.  As Martin pulled the truck out of the service station, an automobile in which the plaintiff was a passenger collided with the driver's side of the truck.  *Id*.  Martin testified that, at the time of the accident, he had only gotten about two hours of sleep in approximately the previous 36 hours prior to the accident.  *Roszell*, 591 So.2d at 513. The plaintiff pointed to Martin's lack of sleep as evidence of wantonness, and asserted that the operation of a 24-foot truck by a driver who had not had the necessary sleep is at least evidence sufficient to create a jury question as to wantonness.  *Id*.  The Alabama Court of Civil Appeals upheld the trial

court's decision to grant a directed verdict in Martin's favor on the wantonness claim. *Id*. at 514.

The court concluded that the circumstances surrounding the accident did not support a legitimate inference that the driver had actual knowledge of premonitory symptoms of the approach of sleep because, unlike in the instant case, the accident was not the kind typically caused by a driver who has fallen asleep at the wheel. In *Roszell*, the accident occurred as Martin pulled the U-Haul out of a service station lot into lanes of oncoming traffic, after he and Hurston stopped for gas and a soda. Martin and Hurston both testified that they looked for oncoming cars as they pulled into the road, and that both were attentive to the task of crossing the road. The *Roszell* court compared the circumstances surrounding the accident in that case, with circumstances which would support a legitimate inference that the driver had knowledge of premonitory symptoms of the approach of sleep. The court noted that Martin was not driving the U-Haul truck on an open road at a high rate of speed, "where the likelihood of his 'nodding off' [was] a more plausible inference." *Id*. The instant case involves an accident of the kind described by the *Roszell* court, typically caused by falling asleep at the wheel.

*Lankford*, on the other hand, involves the kind of accident at issue here; one typically caused by a sleepy driver. In *Lankford*, the estate of a deceased passenger sued the driver of the automobile in which both were traveling when it crashed into a bridge abutment. 214 So.2d at 301. The driver was an entertainer who lived in Anniston,

9

Alabama, and had traveled to Atlanta to seek employment. *Id.* at 303. He left Anniston at approximately 2:00 p.m. on Monday afternoon, arrived in Atlanta at approximately 6:00 p.m., found a job as a piano player and singer, and worked until approximately 12:30 a.m. on Tuesday morning. *Id.* He also worked from 9:00 p.m. on Tuesday night until approximately 12:30 a.m. on Wednesday morning, when he left Atlanta for Anniston. *Id.* He picked up the passenger in Estelle, Georgia, and they talked for about twenty-five minutes until the passenger went to sleep. *Lankford*, 214 So.2d at 303. At some point thereafter, the car struck a bridge abutment. *Id.* The driver testified that he did not know what happened, but that he could have fallen asleep. *Id.* at 304. The last thing he remembered seeing was a speed limit sign, which was two tenths of a mile from the bridge abutment. *Id.* The driver acknowledged that he "had little sleep" on Monday night, had "gotten up early" on Tuesday morning, and did not sleep again prior to the accident early Wednesday morning. *Lankford*, 214 So.2d at 304.

The Alabama Supreme Court held that there was "a consciousness or awareness of sleepiness, tiredness and fatigue," in addition to the evidence of "no sleep since early on [Tuesday morning]," "several hours of work as an entertainer, and a drive of approximately eighty miles." *Id.* According to the court, these factors "add[ed] to the awareness of the hazard of harm," and thus created a question for the jury as to "whether he had knowledge of facts which would disclose the danger of going to sleep to any reasonable man." *Id.*

10

As Defendants correctly point out, *Lankford* and several of the cases upon which plaintiff relies were decided pursuant to Alabama's old "scintilla rule," under which "a question must go to the jury if the evidence or the reasonable inferences arising therefrom furnish a mere gleam, glimmer, spark, the least particle, the smallest trace, a scintilla, in support of the theory of the complaint." *Lankford*, 214 So.2d at 301.  In 1987 however, Alabama's "scintilla rule" was replaced by a higher standard under which proof by "substantial evidence" is now required to create a dispute of material fact sufficient to submit an issue to a jury.  Ala. Code. 1975 § 12-21-12; *Johnson v. Stewart*, 854 So.2d 544 (Ala. 2002).

In *Roszell* the Alabama Court of Civil Appeals addressed the tension in the case law which has resulted from the application of two separate standards.  591 So.2d 513-14. There, the court explained that "[e]ven under the old 'scintilla rule,' this jurisdiction has required that there be a legitimate inference of knowledge of premonitory symptoms before submitting the issue of wantonness to a jury.  Importantly, in the cases where the issue has been submitted to the jury, actual testimony of drowsiness or sleepiness has bolstered such an inference."  *Id*. at 513-14.  However, the court was careful to note that "a driver's realization of such premonitory symptoms need not be shown by direct proof and may be made to appear by showing circumstances from which the fact of actual knowledge is a legitimate inference. . . " *Id*. at 514.

Here, on June 20, 2005, McDaniel and Hood drove from Athens to Atlanta, picked

up a load of furniture, drove to St. Louis, unloaded the truck, and spent the night of June

21, 2005 at a motel between St. Louis and Springfield, Missouri.[6]  (Doc. 35 at 8.)  On the

morning of June 22, 2005, McDaniel and Hood drove to Springfield and picked up a new

load.  (Doc. 35 at 9.)  In Springfield, McDaniel and Hood spent seven to nine hours

carrying a family's household goods down three or four flights of stairs and loading the

goods in the truck.  (*Id.*)  Prior to leaving Springfield, McDaniel and Hood discussed "the

sleeping situation" with Comer.  (*Id.*)  Comer urged McDaniel and Hood to get a motel

room and offered to pay for the room.  (*Id.*)  McDaniel and Hood did not get a motel

room.  (Doc. 35 at 9.)  They left Springfield between 9:00 p.m. and 11:00 p.m., and drove

toward Birmingham, Alabama.  (*Id.*)  The accident occurred at approximately 6:20 a.m.

on June 23, 2005.  (Doc. 35 at 4.)  Both Hood and McDaniel deny any memory of the

collision, and both claim that the other was driving at the time.

It is the opinion of this court that plaintiff has presented substantial evidence from

which a jury could reasonably infer that the driver, Hood or McDaniel, continued to drive

in reckless disregard of premonitory symptoms of sleepiness.  Thus, Defendants' Motion

for Summary Judgment is due to be denied as to Plaintiff's claim against Hood for

wantonness.  It is also the opinion of the court that the evidence of record is sufficient to

support a reasonable jury's finding that Stanford has proven, by clear and convincing

---

[6] Defendants did not file a Reply to Stanford's Response to the Motion for Partial
Summary Judgment, (doc. 35).  Therefore, pursuant to Exhibit A of this court's Scheduling
Order, (doc. 16), Stanford's "Additional Undisputed Facts" are deemed admitted by defendants
for summary judgment purposes.

evidence, that the driver "consciously or deliberately engaged in wantonness" in accordance with Ala. Code §§ 6-11-20(a), (b)(4).  Therefore, the jury will be allowed to consider Stanford's request for punitive damages.

## C.    IRONMAN

### 1.    Respondeat Superior

Stanford seeks to recover from the driver's employer, Ironman, for the driver's wantonness and/or negligence under the theory of respondeat superior.  Alabama Code § 6-11-27(a) provides:

> A principal, employer, or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee, or servant of said principal, employer, or master unless the principal, employer, or master either:
>
> (i) knew or should have known of the unfitness of the agent, employee, or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others; or
>
> (ii) authorized the wrongful conduct; or
>
> (iii) ratified the wrongful conduct; or unless the acts of the agent, servant or employee were calculated to or did benefit the principal, employer or other master, except where the plaintiff knowingly participated with the agent, servant, or employee to commit fraud or wrongful conduct with full knowledge of the import of his act.

Ala. Code  6-11-27(a).  Stanford claims that Ironman is vicariously liable for the driver's alleged wanton misconduct because the driver's acts "were calculated to or did benefit the employer," and because Ironman (Comer) authorized and/or ratified the driver's conduct.

13

The accident at issue occurred while the driver was transporting a load of household goods in the line and scope of his duties as a mover and truck driver employed by Ironman.  Therefore, the driver was acting for the benefit of Ironman.  *See Alfa Mut. Ins. Co. v. Roush*, 723 So.2d 1250, 1255 (Ala. 1998) (Employer was liable for the theft and intentional misrepresentations of its employee if the employee's acts were "done for the employer's benefit, i.e., acts done in the line and scope of employment or . . . acts done for the furtherance of the employer's interest."); *Potts v. BE & K Const. Co.*, 604 So.2d 398, 400 (Ala. 1992) ("For [an employer] to become liable for [the] intentional torts of its agent, the plaintiff[ ] must offer evidence that the agent's wrongful acts were in the line and scope of his employment.").  Moreover, a reasonable jury could find that, by allowing the driver to continue driving despite his lack of sleep, Ironman authorized or ratified his wanton conduct.  Accordingly, to the extent that the driver is found to have acted wantonly, Ironman may be held vicariously liable for any damages arising from such conduct.

### 2.      Negligent and/or Wanton Training and Supervision

Plaintiff has also asserted direct claims against Ironman for negligent and/or wanton maintenance, operation, or repair of Ironman's vehicle, and negligent and/or wanton hiring, training, supervision, and/or retention.  In his Brief in Response to the Motion for Partial Summary Judgment, (doc. 35), Stanford concedes that summary judgment is due to be granted as to his claims for wanton and/or negligent maintenance,

14

operation, or repair of the vehicle.  (Doc. 35 at 3.)  In addition, at oral argument,

plaintiff's counsel indicated that plaintiff does not intend to pursue his claims against

Ironman for wanton and/or negligent hiring and/or retention.  Accordingly, those claims

will be dismissed.  Plaintiff's remaining direct claims against Ironman are for wanton

and/or negligent training and supervision.[7]

As an initial matter, the court must address defendants' contention that plaintiff's

claims against Ironman for negligent and/or wanton training and supervision are

subsumed in his respondeat superior claim against Ironman.  As noted by the United

States District Court for the Middle District of Alabama in *Poplin v. Bestway Express*, the

Alabama Supreme Court has not yet addressed this question, and other jurisdictions are

split on the issue.  *Poplin*, 286 F.Supp.2d 1316, 1318 (M.D. Ala. 2003) (Albritton, J.).

One approach is that "it is improper to allow a plaintiff to proceed under two theories of

recovery once the corporation admits that the alleged tortfeasor was its agent acting

within the scope of his employment."  *Poplin*, 286 F.Supp.2d 1316, 1318 (citing Debra E.

Wax, Annotation, *Propriety of Allowing Person Injured In Motor Vehicle Accident to*

*Proceed Against Vehicle Owner Under Theory of Negligent Entrustment Where Owner*

*Admits Liability Under Another Theory of Recovery*, 30 A.L.R.4th 838 (1984)).  The

alternate approach allows a plaintiff "to proceed under both respondeat superior, a theory

---

[7]  Both plaintiff's and defendants' briefs reference a claim for negligent entrustment.
However, plaintiff's Complaint alleges no such claim.  During a July 9, 2007 telephone
conference with the court, plaintiff's counsel conceded that plaintiff does not have a claim
against Ironman for negligent entrustment.

of imputed liability, and negligent entrustment, hiring, supervision, training, retention, theories of direct liability, when the employer admits the agency of the alleged tortfeasor." *Id.*

In *Poplin*, the court stated that "[a]lthough Alabama has not ruled on the specific issue at hand, available case law indicates that the Alabama Supreme Court would hold the torts of negligent entrustment, hiring, training, supervision, and retention as distinct from a negligence claim based on the theory of respondeat superior when the defendant admits liability." *Id*. at 1319 (citing *Bruck v. Jim Walter Corp.*, 470 So.2d 1141, 1142 (Ala. 1985). The court thus concluded that Alabama would subscribe to the alternate position. *Poplin*, 286 F.Supp.2d at 1319 (citing *Bruck*, 470 So.2d 1141, 1142 (Ala. 1985)); s*ee also Maendele v. Rhet. Trucking, Inc.*, 2005 WL 1367202 (M.D. Ala. 2005) ("It is plain that Alabama law provides that an employer may be directly liable for its own negligent failure to train its employee in addition to being vicariously liable for the acts of its employee pursuant to a respondeat superior theory of liability.") (citing *Poplin*, 286 F.Supp.2d 316)).

In *Bruck*, the trial court excluded evidence necessary to the plaintiff's negligent entrustment claim on the ground that the evidence would have been prejudicial to the defendant with regard to the plaintiff's negligence claim. 470 So.2d at 1143-45. The Alabama Supreme Court found that the trial court erred when it excluded the evidence which was "highly relevant, if not essential" to plaintiff's negligent entrustment claim. *Id*.

16

The court held that the plaintiff had the right to proceed on each of the two separate and distinct claims, and that the lower court's ruling was in error because it had effectively abolished plaintiff's negligent entrustment claim. *Id.* The Alabama Supreme Court did not choose to solve the problem presented in *Bruck* "by merging the negligent entrustment claim into the respondeat superior theory of liability." *Poplin*, 286 F.Supp.2d at 1320. "Rather, the court advised that [trial] courts must take the necessary measures to prevent prejudice caused by evidence of one claim in relation to the other." *Poplin*, 286 F.Supp.2d at 1320 (discussing *Bruck*, 470 So.2d at 1143-44). This court agrees with and adopts the analysis of the District Court for the Middle District of Alabama in *Poplin*. Accordingly, defendants' Motion for Partial Summary Judgment will be denied to the extent that it is based on their contention that Stanford's direct claims against Ironman are subsumed by his respondeat superior claims against Ironman.

The court will now address defendants' Motion for Summary Judgment concerning the merits of plaintiff's direct claims against Ironman. Plaintiff alleges that Ironman provided inadequate training and supervision to its drivers with respect to federal safety regulations including, but not limited to, the driving-time limitations set by the Federal Motor Carrier Safety Administration ("FMCSA").

It is undisputed that  Ironman was operating the subject truck as an interstate motor carrier "responsible for the management ... of commercial vehicles, or the hiring, supervising, [or] training ... of drivers" thus, it was incumbent upon Ironman to "be

17

instructed in and comply with the [promulgated] rules." 49 C.F.R. § 392.1. Those rules

include 49 C.F.R. § 392.3 which states, in pertinent part, as follows:

> No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin on continue to operate the commercial motor vehicle.

49 C.F.R. § 392.3 (emphasis added).[8]

### a.   *Negligent Training and Supervision*

In order to maintain a claim for negligent training and supervision, Stanford must

show that the Ironman knew or should have known of the inadequacy of the training or

supervision prior to the time when it allegedly resulted in harm to the plaintiff.   *Big B,*

*Inc. v. Cottingham*, 634 So.2d 999 (Ala. 1993).   In *Cottingham* for example, the plaintiff

brought negligent training and supervision claims against a retail store claiming that she

had been subjected to assault, battery and false imprisonment by the store manager. 634

So.2d at 1003-04. The trial court allowed plaintiff's claim of negligent hiring and

---

[8] Ironman contends, as a threshold matter, that the subject truck is not a "commercial motor vehicle" (CMV) pursuant to the definition of CMV in 49 C.F.R. § 383.5, and thus, that neither it nor its driver is subject to the requirements set out in 49 C.F.R. § 392.3. Stanford contends, and the court agrees, that the definition of CMV contained in 40 C.F.R. § 390.5, and not that in § 383.5, applies. (See Docs. 42, 44, 48.) It is undisputed that the subject truck in the instant case meets the definition of CMV found in 49 C.F.R. 390.5. Therefore, the operator of the subject truck and Ironman, the motor carrier by which he was employed, were under a duty to comply with the requirements set out in 49 C.F.R. § 392.3.

18

supervision to go to the jury, and the Alabama Supreme Court upheld its decision because the retail store had not reviewed the training manuals with the manager or otherwise trained him prior to the incident, and because the retail store was aware of a similar incident of misconduct by the manager prior to the incident giving rise to the lawsuit. *Id*.

In *Maendele*, a case involving a commercial trucking accident, the plaintiffs claimed that the employer provided its driver with inadequate training with respect to driving-time limits set by the FMCSA. The employer provided the driver with various manuals relating to safe driving and regulations governing driving but never reviewed the manuals with its driver, Crowell. While Judge Fuller found that the question of the employer's direct liability under a failure-to-train theory was "close" call, he relied on the absence of any prior incidents that could have or should have put the employer on notice that the driver needed greater training or supervision. The employer had no reason to suspect that this driver would drive longer than federal regulations permitted prior to the subject accident. Absent such suspicion, it was not possible to find that the employer failed to adequately train or supervise its driver.

The evidence in the instant case indicates that, prior to the subject accident, Ironman was in possession of information from which it had reason to suspect that its drivers were likely to drive longer than federal regulations permitted. First, it is evident from the testimony of Ironman's owner and sole manager, Matthew Comer, that he was generally unfamiliar with the Federal Motor Carrier Safety Regulations ("FMCSRs").

19

Moreover, it seems that Ironman made little or no effort to operate its business in compliance with federal safety regulations.  Comer effectively acknowledged that he did not follow federal safety regulations in training, and/or supervising his drivers.  He testified, and Hood and McDaniel confirmed, that Ironman did not provide any formal driver training to newly hired truck drivers, and that Ironman did not have a training manual, or an employee handbook of any kind.  (*Id.* at 43-44; Pl.'s Ex. 3, Hood Depo. at 18, 20-21; Pl.'s Ex. 4, McDaniel Depo. at 45-46.)  McDaniel testified that he does not recall receiving any training, (Pl.'s Ex. 4, McDaniel Depo. at 45), and Hood testified that Comer made sure that he was able to drive a truck by riding with him a few times, although Comer did not ride with Hood the first time he drove a truck for Ironman.  (Pl.'s Ex. 3, Hood Depo. at 20-21.)

The complete lack of training in this case distinguishes it from both *Cottingham* and *Mandele*.  In those cases the employees received training manuals from their employers, but were not given additional training on the information in the manuals. Ironman not only failed to give its drivers any formal training, but it also failed to give its drivers a manual or handbook of any kind, or even a copy of the FMCSRs with which they were required by federal law to comply.  Moreover here, unlike in *Maendele*, the employer had reason to suspect that his drivers were likely to drive longer than the federal regulations permit.  Prior to the underlying accident, Ironman and its drivers received numerous citations for violations of several federal safety regulations, (Pl.'s Ex. 2, Comer

20

Depo. at 60), yet Comer did not reprimand or otherwise sanction the offending drivers

and did not change how he trained or supervised his drivers.  The record reveals that

Ironman and its drivers had received the following citations in the year prior to the

accident at issue: (1) on October 25, 2005 for log book violation(s), failure to obey a

traffic control device, non-compliance with driver medical certificate requirements, and

two lighting violations; (2) on February 1, 2005 for log book violation(s), non-compliance

with driver medical certificate requirements, and "other" unspecified violation; (3) on

February 26, 2005 for operation by a disqualified driver, non-compliance with driver

medical certificate requirements, and three "other" unspecified violations.  (Pl.'s Ex. 2,

Comer Depo. at 60, 62-72; Pl.'s Ex. 2, Comer Depo., Ex. 3 at 10, 12.)  Comer testified

that there was no formal response by Ironman when a driver received a citation, and that

he did not keep a file containing documentation of each citation, but that he thought the

drivers received some sort of ticket documenting the violation.  *Id*. at 65; 169-70.  He also

says that he did not run checks on drivers to find out if they had received citations of

which they had not informed him, instead he counted on his drivers to inform him of

citations they received.  *Id*. at 169-70.  Comer testified that he never really got involved

when his trucks got stopped at weigh stations for violations of the FMCSRs but, rather,

that he let the drivers "figure it out" with the federal authorities at the weigh station.  *Id*.

at 159-60.

Based on the forgoing, it would be reasonable to infer that previous violations of

federal safety regulations by its drivers were either known to Ironman, or should have been discovered by Ironman had it exercised due care and proper diligence. *See Cottingham*, 634 So.2d at 1003. Under the circumstances, a reasonable jury could conclude that Ironman knew or should have known of the inadequacy of its drivers' training and supervision with regard to the FMCSRs. *Id.* Accordingly, defendants' Motion for Summary Judgment will be denied as to plaintiff's claim for negligent training and supervision.

### b.    *Wanton Training and Supervision*

Stanford also claims that Ironman's failure to adequately train and supervise its drivers rises to the level of wantonness, for which he seeks compensatory as well as punitive damages. As previously stated, wantonness is defined in Ala. Code § 6-11-20(b)(3) as "conduct which is carried on with a reckless or conscious disregard of the rights or safety of others." To survive summary judgment on his wanton training and supervision claim Stanford must proffer ***substantial evidence*** from which a jury could find that Comer made a conscious decision to ignore the FMCSRs, knowing that to do so would likely put the safety of others at risk. See *Cottingham*, 634 So.2d 1004. Further, in order to maintain his claim for punitive damages, plaintiff must adduce evidence from which a jury could make the requisite finding by ***clear and convincing*** evidence. Ala. Code §§ 6-11-20(a), (b)(3)-(4).

In *Trotter v. B & W Cartage Co., Inc.*, No. 05-cv-0205-MJR, 2006 WL 1004882

(S.D. Ill. Apr. 13, 2006), the Trotters' son died in an accident caused by a fatigued truck driver.  There was ample evidence of a violation of the federal safety regulations governing the hours of service for commercial truck drivers.  The trial court noted B & W's duty to require its drivers to observe all federal safety regulations.  Relying on the testimony of B & W's long-time Director of Safety Rules Compliance as to B & W's actual practices, the trial court found that "[a] reasonable inference [may] be drawn ... that B & W operated for a substantial period of time, possibly as much as seven years, in conscious indifference to its duties under the FMCSRs governing driver hours of service."  Id. * 6.  The trial court further found that "[a] reasonable inference [may] be drawn ... that B & W ignored its duties under FHWA hours of service regulations ... and telegraphed to drivers its approval of violations of the hours of service regulations."  Id. at * 7.  The trial court wrote:

> The Court concludes that, on this record, reasonable jurors could find that the imposition of [punitive] damages for aggravating circumstances is warranted.  The evidence of record indicates that for five years or more prior to Ryan Trotter's death B & W operated with conscious indifference to its regulatory duty to maintain management systems effective in preventing hours of service violations by drivers.  The evidence of record also suggests that the conduct of B & W employees like the managers of the company's terminals in Clayton, Ohio, and Gary, Indiana, was such as to send a message to drivers that hours of service violations were acceptable conduct.

Id. at * 8.

In a footnote, the Trotter court referenced a number of opinions from a variety of

jurisdictions that involved a similar factual scenario and wherein the court found that the trucking company's conduct was wanton or reckless so as to allow the awarding of punitive damages in connection with a claim of wrongful hiring, training, or supervising. Among the referenced opinions is *Osborne Turck Lines, Inc. v. Langston*, 454 So. 2d 1317 (Ala. 1984). The critical fact in *Trotter* and the referenced opinions was the motor carrier's overlooking or condoning the driver's driving while fatigued.

   As previously discussed at length, Ironman's owner and sole manager, Matthew Comer, admitted to being unfamiliar with federal safety regulations and effectively acknowledged that he did not follow federal safety regulations in training, and/or supervising his drivers. Prior to the underlying accident, Ironman and its drivers received citations for violations of several federal safety regulations. Yet, Comer did not reprimand or otherwise sanction the offending drivers and did not change how he trained or supervised his drivers. For instance, Comer testified that, because he was "sick of getting [logbook infraction] tickets," he bought a pack of five or six blank logbooks at a truck stop for his drivers to use. (Pl.'s Ex. 2, Comer Depo. at 80-82.) Nevertheless, the evidence suggests that Ironman did not require its drivers to keep accurate and up-to-date logbooks, and thus that it did not require its drivers to abide by the driving-time limitations that logbooks were designed to help enforce.

   During his deposition, when he was asked if he was required by his employer to keep logbooks, McDaniel answered: "[n]ot that I know of." (Pl.'s Ex. 4, McDaniel Depo.

24

at 46-47.)  Hood testified that it was his understanding that Ironman required the drivers to keep logbooks, but that he did not know "how to keep track of none of that," and that he had not been responsible for logging on any of his twenty or more trips for Ironman. (Pl.'s Ex. 4, Hood Depo. at 47.)  Hood says that McDaniel was responsible for the log book on the trip at issue, but that he does not recall ever seeing McDaniel record driver changes or make any other entries in a logbook during their trip.  *Id.* at 95-96.  Hood also testified that he has never seen a driver turn a logbook in to Comer.  *Id.* 47, 54-55.

The evidence discussed thus far is sufficient to support an inference that Ironman's conscious disregard for its duties under the FMCSRs sent a message to its drivers that exceeding federal driving-time limitations was acceptable conduct and, thus, that Ironman operated his business with reckless or conscious disregard of the rights or safety of others.

More specifically however, Comer's testimony suggests that, with conscious disregard for the safety of others on the road with the subject Ironman truck in the early morning hours of June 23, 2005, Comer violated his duty under 49 C.F.R. 392.3 not to "permit a driver to operate a [CMV], while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue . . . as to make it unsafe for him/her to begin on continue to operate the commercial motor vehicle."  Comer stated that McDaniel called him prior to leaving Springfield and that, from talking with McDaniel, he concluded that McDaniel and Hood were fatigued and should check into a motel for the night before traveling onto Birmingham.  (Pl.'s Ex. 2, Comer Depo. at 98, 106-07.)

Comer testified that he "begged and pleaded" the pair to get a motel room, but he acknowledged that McDaniel was "loose" about spending the night.  *Id*. at 99, 108. Comer was aware of the drivers' lack of sleep and of the strenuous nature of the move they completed that day, yet Comer did not order or instruct McDaniel to check into a motel for the night.  Instead, with full knowledge of the work that Hood and McDaniel did that day and during the preceding days and with full appreciation that both were fatigued, Comer allowed the pair to drive from Springfield to Birmingham.

In light of the evidence of record, the court finds that plaintiff has adduced evidence from which a reasonable jury could conclude, by clear and convincing evidence, that, by failing to adequately train and supervise its drivers concerning the FMCSRs, Ironman acted "with a reckless or conscious disregard of the rights or safety of others" pursuant to Ala. Code § 6-11-20(b)(3).  Therefore, as to plaintiff's wantonness claims against Ironman for both compensatory and punitive damages, defendants' Motion for Summary Judgment will be denied.

## IV.  CONCLUSION

Based on the forgoing, the court finds that the Motion for Partial Summary Judgment (doc. 31) of Defendants Hood and Ironman is due to be denied, and Defendant McDaniel's Motion for Joinder in Motion for Partial Summary Judgment (doc. 37)  is due to be denied.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the 18th day of January, 2008.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE